## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 30 2020, 9:25 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Christopher C. Crawford
Goshen, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of: J.R. and J.M. (Minor Children),

And

V.R. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

December 30, 2020

Court of Appeals Case No.
20A-JT-1307

Appeal from the Elkhart Circuit Court

The Honorable Deborah A. Domine, Magistrate

The Honorable Michael Christofeno, Judge

Trial Court Cause No.
20C01-2001-JT-8
20C01-2001-JT-9

**Tavitas, Judge.**

# Case Summary

V.R. ("Mother") appeals the termination of her parental rights to minor children, J.R. and J.M ("the Children").[1] We affirm.

# Issue

Mother raises a single issue, which we restate as whether the evidence was sufficient to terminate Mother's parental rights.

# Facts

J.R. was born in March of 2013, and J.M. was born in December of 2015 to Mother and C.M. ("Father").[2] On July 26, 2016, the Elkhart County Department of Child Services ("DCS") received a report regarding the Children[3] being potential victims of neglect as a result of Mother's frequent use of both marijuana and cocaine. Subsequent testing revealed that Mother and

---

[1] There is some inconsistency in the filings with respect to the naming conventions employed to identify the Children. We apply these initials in order to be consistent with the juvenile court's order terminating parental rights.

[2] Father, whose parental rights were also terminated, did not appear for the termination hearing. The Children were not placed with him initially due to his criminal history of battering a child. The record suggests that Father's involvement during the pendency of the CHINS proceedings was extremely rare. He does not join in this appeal.

[3] At that time, J.R. was three years old, and J.M. was seven months old.

the Children were positive for cocaine.[4]  On August 15, 2016, the day of the Children's positive test results, DCS filed a CHINS petition and a motion for emergency custody.  The juvenile court granted the emergency custody motion that same day, and on August 16, 2016, the Children were removed from the home.  At a hearing on August 23, 2016, Mother admitted that the Children were CHINS, and the juvenile court adjudicated them accordingly.

[4] On October 19, 2016, the juvenile court entered a dispositional order.  Mother was ordered to: (1) participate in any services and/or programs recommended by the DCS case manager "without delay or missed appointments"; (2) complete any requested assessments; (3) comply with random drug screens; (4) complete a substance abuse assessment; (5) participate in supervised visitation with the Children; and (6) participate in parenting education.  Appellant's App. Vol. II p. 60.

[5] Mother's compliance with the dispositional order, as well as subsequent court orders, was less than complete.  At a hearing on July 13, 2017, despite Mother's recent positive drug screen for methamphetamine, the DCS case manager described Mother as "[o]verall . . . compliant with meeting the minimum requirement of the case plan."  Tr. Vol. II p. 48.  By May 17, 2018, however, the DCS case manager reported, after another recent positive drug screen (this

---

[4] It is not clear how the Children managed to ingest cocaine.  The juvenile court judge suggested that, perhaps because of their very young age, the Children were inclined to put whatever they found in their mouths.

time for cocaine), that Mother "has been incarcerated two times since the last court hearing." *Id*. at 60. By October 18, 2018, Mother had "been incarcerated during much of the time since the previous hearing in May. A drug screen administered to her on May 24 was positive for cocaine. And, she was arrested over the summer and has been incarcerated and unable to participate in services." *Id*. at 70. Mother periodically "attended classes and [was] participating in groups"; however, Mother also struggled to provide required nutritional aids for J.M.'s dysphagia[5] and faced eviction. *Id*. at 80, 92-93.

[6] Mother's compliance with visitation was so inconsistent that, by January 9, 2020, Mother was informed that, if she missed another visit, her visitation would be terminated. On January 13, just four days later, Mother missed a visit and reported that she "overslept and did not hear her phone ring." *Id*. at 115-16. The Children's foster mother ("Foster mother") reported that Mother missed a scheduled visit with the Children on Christmas Eve. The Children were nearly three and seven years old at the time. After being ordered to attend therapy, Mother's attendance was intermittent at best.

[7] DCS filed a petition to terminate parental rights on January 23, 2020. By June 4, 2020, Mother's compliance and accountability had deteriorated to the point that the DCS case manager reported, "I don't really know, specifically, where

---

[5] Dysphagia is a medical condition characterized by difficulty in swallowing.

[Mother] lives." *Id*. at 133. The juvenile court conducted a fact-finding hearing on the termination of parental rights petition on June 12, 2020.

[8] At the fact-finding hearing, the DCS case manager, Tonya Greenwood, testified at length about Mother's erratic compliance with the CHINS case requirements. Greenwood related that, although Mother completed an initial ten-week drug course, she repeatedly tested positive for drugs. Mother had been incarcerated multiple times, during which visitation with the Children was a virtual impossibility. In late 2019, Mother began to experience apparent paranoid delusions regarding home invasion. Additionally, the parent-child therapy that had been ordered was cancelled after Mother failed to appear for the initial intake appointments.

[9] Next, a family consultant, Nicole Smith, testified that Mother's visitation had been cancelled as a result of missed appointments. Foster mother testified, describing J.M.'s medical issues and echoing Greenwood's concerns regarding Mother's struggles to adequately address those health issues. Foster mother also described behavioral issues with both Children, apparently stemming from occasions when Mother failed to appear for, or communicate about, visits with the Children. Child and family therapist, Geri Bough, confirmed that the cycle of Mother's progress with visitation, followed by inevitable regression, had a significant and negative impact on the Children and their behavior.

[10] Finally, Mother testified and claimed that she had complied with all services and attended all visits, however, she also gave a conflicting account and

admitted that she had missed visits and therapy sessions. Mother also testified that she did not believe the Children suffered from any significant difficulties associated with visitation, and that both DCS and Foster mother were non-responsive to Mother's phone calls and letters in which Mother sought communication with the Children. Mother downplayed her drug addiction and testified that she used drugs to "clear [her] head." Tr. Vol. II pp. 250. Mother was unable to explain how the Children tested positive for cocaine.

[11] On June 16, 2020, the juvenile court entered an order terminating Mother's and Father's parental rights. The juvenile court entered findings of fact and conclusions thereon, including that the Children "have not lived with either their mother or father for nearly four years"; that there was a "reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the children"; that "[t]ermination of the Parent-Child relationship is in the best interest of [the Children]"; and that "there is a satisfactory plan for the care and treatment of [the Children]." Appellant's App. Vol. II pp. 13-14, 18-19, 20. Mother now appeals.

## Analysis

[12] Mother challenges the termination of her parental relationship with the Children. The Fourteenth Amendment to the United States Constitution protects the traditional rights of parents to establish a home and raise their children. U.S. const. amend. XIV; *see also In re K.T.K. v. Indiana Dept. of Child Services, Dearborn County Office,* 989 N.E.2d 1225, 1230 (Ind. 2013). "[A] parent's interest in the upbringing of [his or her] child is 'perhaps the oldest of

the fundamental liberty interests recognized by th[e] [c]ourt[s].'" *Id.* (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). We recognize, however, that parental interests are not absolute and must be subordinated to the child's best interests when determining the proper disposition of a petition to terminate parental rights. *Id.* (citing *In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009)). Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities by failing to provide for the child's immediate and long-term needs.'" *K.T.K.,* 989 N.E.2d at 1230 (quoting *In re. D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

[13]    When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re C.G.,* 954 N.E.2d 910, 923 (Ind. 2011). We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)).

[14]    Pursuant to Indiana Code Section 31-35-2-8(c), "[t]he trial court shall enter findings of fact that support the entry of the conclusions required by subsections (a) and (b)" when granting a petition to terminate parental rights.[6] Here, the

---

[6] Indiana Code Sections 31-35-2-8(a) and (b), governing termination of a parent-child relationship involving a delinquent child or CHINS, provide as follows:

> (a) Except as provided in section 4.5(d) of this chapter, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship.

juvenile court did enter findings of fact and conclusions thereon in granting DCS's petition to terminate Mother's parental rights. When reviewing findings of fact and conclusions thereon entered in a case involving the termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the juvenile court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the juvenile court's conclusions or the conclusions do not support the judgment. *Id.*

[15] Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

(B)     that one (1) of the following is true:

(i)     There is a reasonable probability that the conditions that resulted in the child's removal

_____

(b)  If the court does not find that the allegations in the petition are true, the court shall dismiss the petition.

or the reasons for placement outside the home of the parents will not be remedied.

    (ii)     There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)    that termination is in the best interests of the child; and

(D)    that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016).

### A. Threat to Well-Being of the Children

[16]    Mother's claims can be distilled into a challenge to the sufficiency of the evidence underlying the juvenile court's conclusion that a continued parent-child relationship threatens the Children's well-being.[7] When considering

---

[7] In Mother's summary of her argument, she appears to suggest that the termination of her parental rights is not in the best interest of the Children. Mother, however, fails to actually make that argument in the remainder of her brief, and the issue is, therefore, waived for failure to make a cogent argument. *See* Ind. App. R. 46(A)(8)(a). To the extent that Mother argues that: (1) "the juvenile court inaccurately characterized things in its findings of facts, and did not appropriately note the work [Mother] had done to address her addictions and parental concerns during the CHINS proceedings in her case"; and (2) "the juvenile court failed to properly account for the number of counseling sessions [Mother] had late in the year of 2019, and

whether there is sufficient evidence to support such a finding, trial courts must "consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 152 (Ind. 2005). "At the same time, however, a trial court should judge a parent's fitness to care for his [or her] child as of the time of the termination proceeding, taking into consideration evidence of changed conditions." *Id*. "It is well established that 'a trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship.'" *In re G.F.*, 135 N.E.3d 654, 661 (Ind. Ct. App. 2019) (quoting *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002)).

[17] The evidence below clearly established that, during the CHINS proceedings, Mother periodically tested positive for amphetamine, methamphetamine, cocaine, and alcohol.[8] Mother was repeatedly incarcerated, apparently as a result of driving while being a habitual traffic offender. That combination of being incarcerated and her inability to legally drive when not incarcerated made it difficult for Mother to meet court-ordered requirements, as well as to simultaneously earn the income necessary to provide a stable living

---

then into 2020," Mother asks us to reweigh evidence. Appellant's Br. p. 22. We cannot. *See, e.g., D.D.*, 804 N.E.2d at 264; *see also* Appellant's Br. p. 24.

[8] Though we do note that, of the sixty drug screens administered to Mother over a four-year period, commendably, fifty-four were negative.

environment for the Children.[9] Mother claims that this evidence was somehow insufficient to establish a threat to the well-being of the Children under Indiana Code Section 31-35-2-4. But Mother's arguments do not pertain to the sufficiency of the evidence. Rather, her arguments focus on how much weight was or should have been afforded to the evidence. Such arguments have no place in our review.

[18] Mother was explicitly warned that inconsistent visitation was harmful to the Children and that, if she missed further visits, visitation could be cancelled entirely. Mother subsequently missed four visits. J.R. "has anxiety and tantrums and the more times his mother loops in and out of his life, the longer his periods of acting out; the acting out for this seven-year-old is bullying, aggression, soiling himself[,] and smearing feces." Appellant's App. Vol. II p. 15. Both Children have indicated that they wish to continue to reside with their foster family.

[19] The record regarding the Children's psychological and behavioral struggles is substantial. As the juvenile court identified: "the children have never been able to stabilize because their mother has stopped and started visitation so many times over the history of the cases . . . ." Appellant's App. Vol. II p. 14.

---

[9] The record is replete with Mother's excuses for tardiness and non-appearance, many of which appear to be variants on a theme relating to her job and the travel therefrom.

Mother was given many opportunities to rehabilitate herself and services to assist her. Mother was never able to maintain sobriety and achieve stability.

[20] Invoking a prior holding of this Court, the juvenile court accurately summed up Mother's efforts as follows: "'Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve.'" Appellant's App. Vol. II p. 18 (quoting *In re J.S.*, 906 N.E.2d 226, 234 (Ind. Ct. App. 2009)); *see also* Appellant's App. Vol. II pp. 17-18 ("[Mother] has made some progress throughout the nearly four years that her children have been under the supervision of DCS, but her children's therapist expresses concern over the continued inconsistency demonstrated by mother. . . the children worry that mom will disappear and it is harming the children.").

[21] The record does not support Mother's contention that the juvenile court "didn't properly consider [Mother's] attempts to be in the lives of the minor children during the periods of time of [Mother's] incarceration." Appellant's Br. p. 28. The juvenile court's thorough and detailed order demonstrates that, in its sound discretion, the juvenile court concluded that Mother was "unwilling to meet [her] parental responsibilities by failing to provide for the [Children's] immediate and long-term needs." *K.T.K.*, 989 N.E.2d at 1230 (quoting *D.D.*, 804 N.E.2d at 265). In the absence of clear error, we are neither required nor inclined to revisit the juvenile court's conclusion that a continued parent-child relationship threatens the Children's well-being. Mother had more than ample opportunity to correct her behavior during the four-year CHINS pendency.

Sufficient evidence exists to support the juvenile court's finding that there was a "reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child." *See* Ind. Code § 31-35-2-4(b)(2).

### B. Satisfactory Plan

[22] Finally, Mother challenges the juvenile court's finding that there is a satisfactory plan for the care and treatment of the Children. Indiana courts have held that for a plan to be "'satisfactory'" for the purposes of the termination statute, it "'need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated.'" *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014) (quoting *Lang v. Starke Cnty. Office of Family and Children*, 861 N.E.2d 366, 375 (Ind. Ct. App. 2007), *trans. denied*), *trans. denied*.

[23] DCS is only required to offer a general sense of the plan for the Children after termination of Father's and Mother's parental rights. The juvenile court found that DCS has a satisfactory plan for the care and treatment of the Children: "The children have been placed in foster care with [Foster mother] since October 31, 2016, and [Foster mother] has expressed the intent to petition for adoption should parental rights be terminated." Appellant's App. Vol. II. p. 20; *see, e.g., Lang*, 861 N.E.2d at 375 (holding that adoption and independent living are satisfactory plans). The juvenile court's finding that DCS had a satisfactory plan is not clearly erroneous.

# Conclusion

[24] The juvenile court's termination of Mother's parental rights was not clearly erroneous. We affirm.

[25] Affirmed.

Bailey, J., and Robb, J., concur.